1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**United States District Court**
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

LAWRENCE ANTHONY CUEVAS,

         Petitioner,

  vs.

GEORGE GALAZA,  Warden,

         Respondent.

_____/

No. C 02-2324 PJH (PR)

**ORDER DENYING PETITION
FOR WRIT OF HABEAS
CORPUS**

      This is a habeas corpus case filed pro se by a state prisoner pursuant to 28 U.S.C. §
2254.  The court ordered respondent to show cause why the writ should not be granted.
Respondent has filed an answer and a memorandum of points and authorities in support of
it, and has lodged exhibits with the court.  Petitioner has responded with a traverse.  The
matter is submitted.

**BACKGROUND**

      Petitioner was convicted by a jury of three counts of robbery.  *See* Cal. Penal Code
§ 211.  In a bifurcated proceeding, the jury found that petitioner had four prior felony
convictions and that he had served one prior prison term.  Because two of the prior felony
convictions constituted "strikes" under California "three strikes" law, he was sentenced to
prison for eighty-five years to life.  As grounds for habeas relief he asserts that:  (1) His
sentence was disproportionate, in violation of his Eighth Amendment rights; (2) his due
process rights were violated by the trial court's instruction that the jury was not to consider
what punishment he might receive; (3) his due process rights were violated by an
erroneous jury instruction; and (4) his counsel was ineffective in not moving to suppress
evidence.

**United States District Court**
For the Northern District of California

Petitioner does not dispute the following facts, which are excerpted from the opinion of the California Court of Appeal:

### The Prosecution's Case- Count 2

Count 2 of the amended information alleged that on October 24, 1997, appellant had robbed Rachel Bryan.   The evidence presented at trial was as follows: Rachel Bryan testified that on October 24, 1997, she was employed as a teller at Bank of the West on Washington Avenue in San Leandro. . . . [A man] hand[ed] her a note and [told] her to read it.  The note said, "This is a robbery.  Give me your $100 bills.  This is serious". . . .  Bryan opened her drawer and gathered the money, including the "bait" money that had previously recorded serial numbers, which the bank kept on file. . . .  Bryan handed the man the money, and he left.

Bryan estimated that she had been able to look at the man's face for about four minutes.  On December 12, 1997, she viewed a videotape of a live lineup, and identified appellant as the man who had robbed her at the bank.   She also identified appellant at his preliminary hearing and at trial.  In addition, at trial she identified appellant as the person shown in bank surveillance photos taken on the day of the robbery.

### The Prosecution's Case- Count 3

Count 3 of the amended information alleged that on November 6, 1997, appellant had robbed Mary Moore.  Mary Moore testified that she worked as a teller at Bank of the West on Second Street in Livermore.  On November 6, 1997, about 10:30 a.m., a man came to her window and told her to give him her hundred, fifty, twenty, ten and five dollar bills.  He also showed her a note that said the same thing.  At first she thought he was joking, but then she "took a good look at him to see if he seemed to be serious in his intent."   She concluded that he looked very determined, and that he was serious.  She opened her drawer and gave him some twenties, tens and fives.  He told her to give him hundreds and fifties, and to open her second drawer, where the majority of the teller's money is kept.  After she opened the second drawer, the man reached over the counter and grabbed money from it.  He stuffed the money in his pockets and fled.

Moore was able to observe the robber's facial features for about 30 seconds.  She was unable to identify anyone in a photo lineup shown to her on November 21.  However, on December 5, 1997, she attended a live lineup, and identified appellant as the robber.  She also identified him at the preliminary hearing and at trial.

### The Prosecution's Case- Count 4

Count 4 of the amended information alleged that on November 12, 1997, appellant had robbed Angela Andrews. Angela Andrews testified that on November 12, 1997, she was working as a teller at U.S. Bank on Hesperian Avenue in Hayward.

**United States District Court**

For the Northern District of California

About 1:15 p.m. a man came up to her window and showed her a note that said, "This is a robbery. Give me the money". . . . Andrews felt afraid. She turned to her drawer, pressed the alarm, and gave the man some money. He told her to give him the rest, so she turned back to her drawer, hesitating over a packet of money with a tracking device concealed inside, known as a "track-pack." The man said, "Give me that," which she did. He unfolded a small department store bag with handles, put the track-pack inside, and left. Andrews described the robber as Hispanic, in his late thirties, about six feet one inch tall, and wearing a black jacket, flat black hat, black pants and sunglasses.

When the man left the bank the tracking device began emitting an electronic signal that could be tracked by the police. The police were notified and began following the signal, which led them to 1408 Timothy Drive in San Leandro, a house that belonged to appellant's sister, Gina Cuevas (Gina). Once several police units had arrived, appellant was ordered to come out of the house. Appellant told his sister to say that he was not there, but he eventually came out and was apprehended and searched. Inside his wallet police found several bills with serial numbers matching those from U.S. Bank. Appellant was placed inside the police car, where he asked an officer "what was going on." He was told that the police were investigating a robbery, to which he responded: "There's no way I was involved. I've been at home at my sister's house all day . . . . You've got the wrong guy." Appellant was very nervous and fidgety.

Detective Edward Muniz explained to Gina that the police were receiving a tracking signal from inside her house, and asked for permission to search, which she gave. Inside the house the signal led officers to the southeast bedroom, where they found a paper J.C. Penney bag with the tracking device and money inside. They also found a black jacket, a black hat, a black leather cap and black sweat pants. In a closet containing appellant's belongings police found a hypodermic needle and suspected heroin. In a search incident to appellant's arrest, the police found $420 in crisp one hundred and twenty dollar bills. The next day, the police returned to conduct a further search with Gina's consent. In the spare bedroom they found $2,100 in cash inside a sock.

About 45 minutes after the robbery, officers brought Angela Andrews to the Timothy Street house, where she viewed appellant. She identified him as the person who had robbed her, but observed that he had changed his clothing.

James Freeman, Gina's next door neighbor, testified that around 1:45 p.m. on November 12, 1997, he saw appellant pull up in a red car in front of Gina's house. Gina came out and talked to him, then they the both walked into 1408 Timothy Drive. Appellant was carrying a jacket and a small brown bag. About 10 minutes later, the police arrived, and began yelling for appellant to come out.

The police also searched the car appellant had been seen driving 10 minutes before the police arrived at Gina's. Inside, Detective Stan Brandon found a blank pad of paper. He rubbed a pencil on the top sheet, and impressions of lettering showed up. Upon further inspection by a forensic document examiner, it was

3

**United States District Court**
For the Northern District of California

determined that the indentations on the second and third sheets of the pads were the words: "This is a bank robbery. Give me all the money now."

At trial, Angela Andrews identified appellant as the man who robbed her. She also identified the clothing found in the bedroom at Gina's house as similar to that worn by the robber.

### Defense case

Appellant testified that he was 33 years old, had grown up in Hayward, and had spent most of his youth in juvenile hall and the California Youth Authority. Around October 1997, appellant was trying to pull his life together after his long incarceration. He was attending Chabot College, working construction for his uncle, and seeing a psychiatrist. He testified that he was using drugs in the fall of 1997, and had just finished shooting up heroin when he was arrested. He explained that he had been using heroin since he was nine years old.

Appellant identified the black sweat pants found in Gina's house as his, but did not recognize the jacket. He testified that toward the end of October 1997 he was hospitalized with pneumonia, and that he could not remember where he was on the afternoon of November 6, 1997.

Appellant admitted convictions for burglary in 1986, robbery in 1987 and weapon possession in 1992. He also admitted that he had been convicted for bringing drugs into jail in March of 1999, after his mother brought heroin to him in jail.

Ex. E at 2-6.

### STANDARD OF REVIEW

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). The first prong applies both to questions of law and to mixed questions of law and fact, *Williams (Terry) v. Taylor*, 529 U.S. 362, 407-09 (2000), while the second prong applies to decisions based on factual determinations, *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

A state court decision is "contrary to" Supreme Court authority, that is, falls under the first clause of § 2254(d)(1), only if "the state court arrives at a conclusion opposite to that

4

**United States District Court**
For the Northern District of California

1   reached by [the Supreme] Court on a question of law or if the state court decides a case

2   differently than [the Supreme] Court has on a set of materially indistinguishable facts."

3   *Williams (Terry)*, 529 U.S. at 412-13.  A state court decision is an "unreasonable application

4   of" Supreme Court authority, falling under the second clause of § 2254(d)(1), if it correctly

5   identifies the governing legal principle from the Supreme Court's decisions but

6   "unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413.  The

7   federal court on habeas review may not issue the writ "simply because that court concludes

8   in its independent judgment that the relevant state-court decision applied clearly

9   established federal law erroneously or incorrectly."  *Id.* at 411.  Rather, the application must

10  be "objectively unreasonable" to support granting the writ.  *Id.* at 409.

11      Under 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual

12  determination will not be overturned on factual grounds unless objectively unreasonable in

13  light of the evidence presented in the state-court proceeding." *Miller-El*, 537 U.S. 322 at

14  340; *see also Torres v. Prunty*, 223 F.3d 1103, 1107 (9th Cir. 2000).

15      When there is no reasoned opinion from the highest state court to consider the

16  petitioner's claims, the court looks to the last reasoned opinion.  *See Ylst v. Nunnemaker*,

17  501 U.S. 797, 801-06 (1991); *Shackleford v. Hubbard*, 234 F.3d 1072, 1079, n. 2 (9th

18  Cir.2000).

**DISCUSSION**

**I.      Cruel and Unusual Punishment**

21      Petitioner argues that because the robberies he committed were non-violent his

22  sentence of eighty-five years to life, imposed pursuant to California's three strikes law,

23  constitutes cruel and unusual punishment in violation of the Eighth Amendment.

24      In *Lockyer v. Andrade*, 538 U.S. 63, 69 (2003), the Supreme Court held that relief

25  may be granted to a prisoner in the few cases where the punishment is "grossly

26  disproportionate" to the crime.  The Court also held that two consecutive twenty-five year to

27  life sentences for a petty theft "third strike" offense were not "grossly disproportionate" and

28  do not violate federal law.  *Id.* at 77.

United States District Court

For the Northern District of California

1    In *Ewing v. California*, 538 U.S. 11, 29 (2003), the Supreme Court was clear that

2   when a court reviews the disproportionality of a sentence, it "must place on the scales not

3   only [petitioner's] current felony, but also his long history of felony recidivism. . . .  In

4   imposing a three strikes sentence, the State's interest is not merely punishing the offense

5   of conviction, or the "triggering" offense: 'It is in addition the interest  . . . in dealing in a

6   harsher manner with those who by repeated criminal acts have shown that they are simply

7   incapable of conforming to the norms of society as established by its criminal law." Id. at

8   30, (citing *Rummel v. Estelle*, 445 U.S. 263, 276 (1980)).

9    Here, the State's interest in public safety and deterring recidivist felons justifies the

10   sentence.  *Id.*  According to the California Court of Appeal, petitioner's criminal history

11   began in 1984, when he received a juvenile adjudication for petty theft, burglary, battery on

12   a police officer and falsely identifying himself.  He spent two years in prison for a burglary

13   committed in 1985.  His parole was revoked in 1987 for an aggravated assault.  That same

14   year he was convicted of three counts of robbery and sentenced to twelve years.  In 1992,

15   he was convicted of possession of a weapon in a prison.  Soon after he was put on parole,

16   he committed the three bank robberies.

17    Lengthy periods of incarceration have failed to deter petitioner's criminality.  His

18   sentence is long, but it is supported by the public interest in incapacitating recidivist felons.

19   *Id.* at 29-30.  Further, while petitioner's victims easily succumbed to his demands and the

20   bank robberies did not result in violence, the crimes could easily have turned violent.

21   Under these circumstances, his sentence was not cruel and unusual, and the California

22   appellate court's rejection of this claim was not contrary to or an unreasonable application

23   of clearly established federal law.

24   **II.    Jury Instruction Not to Consider Punishment or Background**

25    Petitioner contends his constitutional rights to a fair trial and due process were

26   violated when the trial court instructed the jury not to consider his "narrative testimony"

27   where he mentioned that he was facing a long sentence under California's "three strikes"

28   law.  He argues that had the jurors "been permitted to consider that [he] was going to

United States District Court

For the Northern District of California

1   spend the rest of his life in prison for three non-violent bank robberies in which he used no

2   gun, it is unlikely it would have convicted him."  Pet. at 24.

3        The following undisputed description of events is taken from the opinion of the

4   California Court of Appeal:

5            In its instructions to the jury, the court gave CALJIC 17.42:
        "In your deliberations, do not discuss or consider the subject of
6        penalty or punishment.  That subject must not in any way affect
        your verdict."  Also, during deliberations, the jury sent out a note,
7        asking for "clarification from Judge Kurtz as to which portions of
        Defendant's so-called 'narrative' testimony can be considered by
8        the jury.  [¶]  Specifically, we want to know about the testimony
        volunteered by the Defendant after counsel and his Honor left the
9        bench."  The judge responded that he had reviewed the statement
        in question and told the jury:  "That was not in response to any
10       question nor is it relevant to any issue.  It does not relate to any
        element of the offense nor does it relate to the issue of identity as
11       to the commission of the offense.  Therefore, that is being stricken
        and you cannot consider it for any purpose.
12

13  Exh. E at 11.

14       Petitioner argues that the jury is the "conscience of the community" and that it

15  retains the power to nullify harsh laws and sentences.  He contends that to be able to

16  exercise that power, the jury must be allowed to consider the penal consequences of a

17  guilty verdict.  Pet. at 23.

18       Petitioner's claim fails because a defendant has no constitutional right to a jury

19  nullification instruction.  *United States v. Powell*, 955 F.2d 1206, 1213 (9th Cir. 1991).

20  Petitioner is correct that "juries [may] acquit out of compassion or compromise or because

21  of their assumption of a power which they had no right to exercise, but to which they were

22  disposed through lenity."  *Standefer v. United States*, 447 U.S. 10, 22 (1980).  However,

23  "the power of juries to 'nullify' or exercise a power of lenity is just that– a power; it is by no

24  means a right or something that a judge should encourage or permit if it is within his

25  authority to prevent."  *United States v. Thomas*, 116 F.3d 606, 615 (2d Cir. 1997).  While a

26  jury may have the power to ignore the law and exercise leniency, a court has no obligation

27  to inform the jury of that right.  *See Powell*, 955 F.2d at 1213.

28       The Supreme Court also provides authority on the matter, stating that "it is well

7

United States District Court

For the Northern District of California

1   established that when a jury has no sentencing function, [footnote omitted] it should be

2   admonished to 'reach its verdict without regard to what sentence might be imposed.'"

3   *Shannon v. United States*, 512 U.S. 573, 579 (1994) (quoting *Rogers v. United States*, 422

4   U.S. 35, 40 (1975).

5       Here, it was the jury's duty to reach its verdict without considering the penalty.  While

6   jury nullification is a reality within our justice system, it is by no means a right under the

7   Constitution.  Because no constitutional right was violated by the instruction, the state

8   courts' rejection of this claim was not contrary to, or an unreasonable application of, clearly-

9   established Supreme Court authority.

10  **III.    Misinstruction on Element of Force or Fear**

11      Petitioner claims that the trial court violated his due process rights when it

12  erroneously instructed the jury on the definition of "force" in its robbery instruction.  At trial,

13  the court attempted to assist the jury with the following clarification:

> Generally, the force by means of which robbery may be committed is either actual or constructive.  The former includes all violence inflicted directly on the person robbed.  The latter encompasses all means by which the person robbed is put in fear sufficient to suspend the free exercise of will or prevent resistance to the taking.  The constructive force means force, not actual or direct, exerted upon the person robbed by operating upon a fear of injury.  Included within the common meaning of 'force' is such threat or display of physical aggression toward a person as reasonably inspires fear of pain, bodily harm or death.

19  Ex. E at 8.

20      Petitioner alleges that the court misinformed the jury that it "need only find that [the

21  victim's] fear was objectively reasonable, not that the victim actually, that is subjectively, felt

22  fear."  Pet. at 17.  Petitioner believes the distinction is crucial to his defense in the third

23  robbery count.  He contends that "[i]f the jury believed that [petitioner] did not use any force

24  and that Moore was not actually afraid, then [he] was entitled to an acquittal on the robbery

25  charge."  Pet. at 18.

26      The California Court of Appeal agreed with petitioner that when the "prosecution

27  seeks to prove a robbery was committed by means of fear, it must present evidence 'from

28  which it can be inferred that the victim *was in fact afraid*, and that such fear allowed the

United States District Court

For the Northern District of California

1    crime to be accomplished."  Ex. E at 8 (citing *People v. Mungia*, 234 Cal.App.3d 1703,

2    1709 (1991)).  However, the court held that the necessary subjective element was

3    conveyed by the instruction as a whole.  *Id.* at 9.

4         Not every ambiguity or deficiency in a jury instruction will rise to the level of a due

5    process violation.  *Middleton v. McNeil*, 541 U.S. 433, 437 (2004) (per curiam).  Jury

6    instructions should not be judged in artificial isolation, but must be examined in the context

7    of the trial record and the jury instructions as a whole.  *Estelle v. McGuire*, 502 U.S. 62, 72

8    (1991).  The question is whether there is a reasonable likelihood that the jury applied the

9    challenged instruction in a way that violated the Constitution.  *Middleton*, 541 U.S. at 437.

10        Here, earlier sections in the instruction conveyed the idea that the victim must

11   actually feel fear.  The instruction said that constructive force "encompasses . . . means by

12   which the person robbed *is put in fear*" and that the victim is "*operating upon [a] fear of

13   injury.*"  Such instructions sufficiently conveyed to the jury that a victim must experience

14   subjective fear.  Further, the arguments of counsel, especially those of defense counsel,

15   made it "clear that the jury was being called on to consider the actual fear experienced by

16   Mary Moore."  Ex. E at 9; *see Middleton*, 541 U.S. at 438 (per curiam) (state court's

17   reliance on prosecutor's argument that resolved ambiguous instruction in favor of

18   defendant particularly apt in concluding there was no instructional error).  Together, these

19   considerations make clear that there was not a reasonable likelihood that the jury applied

20   the instruction in a way that violated the Constitution.

21        Because petitioner's due process rights were not violated by the trial court's giving

22   the instruction, the rejection of this claim by the state appellate courts was not contrary to,

23   or an unreasonable application of, clearly-established Supreme Court authority.

24   **IV.   Ineffective Assistance of Counsel**

25        In his last claim, petitioner argues that his lawyer was ineffective for failing to move

26   to suppress evidence obtained through an allegedly unlawful search.  Pet. at 11.  He claims

27   that police searched his sister's house without her permission, and later gained consent

28   only through psychological coercion by threatening to take away her children.  Pet. at 11.

United States District Court
For the Northern District of California

1  He argues that had defense counsel moved to suppress the evidence, crucial evidence

2  including the track pack, bank money and clothing would have been inadmissible at trial.

3  He believes it is reasonably probable that had counsel provided competent legal

4  representation and this evidence been suppressed, he would not have been found guilty in

5  Count Four.  Pet. at 14.

6        A habeas petitioner challenging a conviction on grounds of ineffective assistance of

7  counsel must demonstrate two things.  First, he must show that his lawyer's representation

8  was deficient and fell below an "objective standard of reasonableness" under prevailing

9  professional norms.  *Strickland v. Washington*, 466 U.S. 687-88 (1984).  Second, he must

10  also show that the deficient legal representation prejudiced his defense, and that "there is a

11  reasonable probability that, but for counsel's unprofessional errors, the result of the result

12  of the proceeding would have been different."  *Id.* at 694.  A court need not determine

13  whether counsel's performance was deficient before examining the prejudice suffered by

14  the defendant as the result of the alleged deficiencies.  *Id.* at 697.

15        This court agrees with the California Court of Appeal that it is not reasonably

16  probable that petitioner would have had a more favorable outcome in Count Four even if

17  evidence obtained from the search of his sister's house were suppressed.  If the

18  prosecution's case were weak, petitioner would be better positioned to show a reasonable

19  probability that the result of the trial would have been different.  *See, e.g., Luna v. Cambra*,

20  306 F.3d 954, 966-67 (9th Cir. 2002).  Here, however, the prosecution's case was

21  extremely strong and was supported by evidence unrelated to the searches.  As indicated

22  by the California Court of Appeal, the bank teller identified petitioner within an hour of the

23  robbery, the signal carried by the track-pack brought police to his doorstep, he was seen by

24  a neighbor entering a house with a bag similar to the one used at the robbery, he appeared

25  nervous and lied to police during questioning, and a pad of paper with an impression of the

26  bank demand note was found in his car.

27        Because petitioner was not prejudiced by the failure to move to suppress, his right to

28  effective assistance of counsel was not violated.  As a result, the rejection of this claim by

1  the state appellate courts was not contrary to, or an unreasonable application of, clearly-

2  established Supreme Court authority.

3  **CONCLUSION**

4      For the foregoing reasons, the petition for a writ of habeas corpus is **DENIED**.  The

5  clerk shall close the file.

6      **IT IS SO ORDERED.**

7  Dated: 9/24/07

8      PHYLLIS J. HAMILTON
       United States District Judge

26  G:\PRO-SE\PJH\HC.02\CUEVAS324.RUL.wpd

United States District Court
For the Northern District of California